FREEMAN v. JAMISON et al.

(Court of Civil Appeals of Texas. Galveston. May 3, 1911. Rehearing Denied June 8, 1911.)

1. MASTER AND SERVANT (§ 243*)—RAILROADS —DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE.

Where a railroad fireman in charge of an engine attached to a freight train on a siding disobeyed orders not to move his train out onto the main track until the passenger train had passed, and moved his train out onto the main track when he knew the passenger train was due, and was killed in a collision which resulted, he was guilty of contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 682, 759–775; Dec. Dig. § 243.*]

2. MASTER AND SERVANT (§ 248*)—DEATH OF SERVANT—DISCOVERING PERIL—FAILURE TO AVOID COLLISION.

Where defendant, an engineer in charge of a passenger train swiftly approaching a switch, knew, or ought to have known by ordinary care, that a freight train had been negligently moved out from the switch onto the main track in front of his train in time to have stopped the same by the use of appliances at hand, but negligently failed to apply the brakes and reverse his engine until too late to prevent a collision, in which both he and the fireman of the freight train were killed, the engineer's negligence in failing to act with sufficient promptness after discovering the peril was the proximate cause of

the fireman's death, for which the railroad company was liable, notwithstanding the fireman's contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 801–804; Dec. Dig. § · 248.*]

Appeal from District Court, Brazos County; J. C. Scott, Judge.

Action by Mary J. Jamison and others against T. J. Freeman, as receiver of the International & Great Northern Railroad Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

King & Morris and Doremus & Butler, for appellant. A. G. Board, A. G. Greenwood. and Thos. B. Greenwood, for appellees.

PLEASANTS, ·C. J. This suit was brought by appellees, Mary J. Jamison and Carroll Jamison, the widow and minor son of G. S. Jamison, deceased, to recover damages sustained by the death of said G. S. Jamison, which the petition alleges was caused by the negligence of the agents and employés of the appellant. The petition alleges, in substance, that on March 31, 1908, the deceased, G. S. Jamison, was in the employment of the appellant T. J. Freeman, receiver of the International & Great Northern Railroad Company, as fireman on a local freight train on said railroad running from Mart, Tex., to the city of Houston; that on the date named when said train, on its way to Houston, arrived within the yards of said railroad company at the town of Navasota, the engineer left the engine, and placed same in charge of said G. S. Jamison, whose duty it then became to operate the engine within said yards; that while in the performance of this duty, and when his train was upon a side track in said yards, the head brakeman of the crew operating said train threw the switch leading from the side track to the main track of said railroad and by signal directed said Jamison to move the train out on the main track; that, in obedience to this signal, Jamison took the train out on the main track, and just after clearing the switch his train was run into by the north-bound passenger train on said railroad, and as a result of such collision Jamison received injuries which caused his death a few days thereafter. The death of Jamison is alleged to have been caused by the negligence of appellant's employés, the brakeman of the freight train and the engineer and other operatives of the passenger train.

In view of the conclusion we have reached upon the issue of contributory negligence on the part of Jamison in going out upon the main track, the only charge of negligence that will be considered in this opinion is that based upon the failure of the operatives of the passenger train to use proper care to prevent injury to Jamison after they had discovered his peril. The defendant answered

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

by general demurrer and general· denial, and by special plea averred that plaintiffs were not entitled to recover, because the death of G. S. Jamison· was proximately caused by his contributory negligence in taking his train from the side track out on the main ·track at a time when he knew, or must have known in the exercise of ordinary care, that the passenger train on said railroad was about due to arrive, without sending some one· ahead on the main track to flag the passenger train. in time to prevent a collision. The plea sets out the rules of the appellant .for the guidance of the operatives of trains on said railroad, which had been furnished Jamison, and which require all freight trains to give way to passenger trains, and, when a freight train is to be met and passed by a passenger train at a station or siding, require it to get in on the side track at least five minutes before the time for the arrival of the passenger train, and to remain on the siding until after the passenger train has passed, and further requiring that, if the freight train is moved out on the main track before the passenger train has passed, before such movement is made some one should be sent ahead a sufficient distance to flag the passenger train in time to prevent a collision. It is further averred that Jamison was expressly told by the engineer when the engine on the freight train .was turned over to him not to take said train out on the main track until after the passenger train had passed.

Defendant further pleaded contributory negligence on the part of said Jamison as follows: "That, when the said G. S. Jamison ran engine No. 128 out on the main line railroad track of defendant, he knew and saw the engine attached to passenger train coming on the track his engine was on; that he saw and well knew that said engine would collide with his said engine, and well knew that if he remained upon said engine No. 128, and well knew that said collision would naturally result in his being seriously injured, but notwithstanding the said Jamison knew and realized that said engine of said passenger train was running and coming towards and also in close proximity to the engine he was on, and notwithstanding he knew and realized the position of peril and danger he was in by remaining upon engine No. 128 carelessly and negligently remained upon said engine until he was injured and from such injuries died, when by the exercise of ordinary diligence and care for his own safety could have abandoned his said engine, and could have jumped from his said engine in ample time to have avoided the injury and his death. That said negligence and contributory negligence on the part of said G. S. Jamison, as aforesaid, was the direct and proximate cause of his injury and death, and for which this defendant is in no way liable in damages to plaintiffs." The .trial in the court below with a jury resulted in verdict and judgment in ·favor of the plaintiffs for the sum ·of ·$5,000; ·apportioned one-half ·to each of the plaintiffs.

Appellant presents but two assignments of error. The· first complains of the refusal of .the court to give a special charge asked by ·the defendant in which the jury were instructed to return ·a verdict for the defendant and the second complains of the· verdict and ·judgment as being without evidence to support them, and against the great weight and preponderance of the evidence.

[1] As before indicated, we think the evidence shows that Jamison was guilty of contributory negligence in taking his train out on the main track at a time when he knew, or must have known in the exercise of ordinary care, that the passenger train was due to arrive in a few minutes or seconds, and without taking proper precaution to prevent a collision with said passenger train; . but it does not follow from this conclusion that the trial court erred in refusing to instruct the jury to find for the defendant, and in refusing to set aside the verdict on the ground that it is not supported by the evidence and is against the great weight and preponderance of the evidence. Notwithstanding Jamison's negligence in placing himself in a position of peril, if the operatives of the train which ran into his saw and realized his peril in time to have prevented his injury by the use ·of proper care, appellant would be liable to appellees for the injury caused them by the .death of· Jamison resulting from such want of care on the part of his employés.

[2] The evidence upon the issue of discovered peril is as follows: H. V. Smith, the brakeman who operated the switch to let Jamison's train out .on the main track, after stating a conversation had by him with Jamison as to whether they should take the train out on the main track, testified: "After I conversed with Jamison, I walked on pretty fast towards the switch, and Jamison followed with the engine and six cars. I opened the switch and the .engine and the six ·cars just did get· onto the main line before the collision occurred, I think. It is not a fact that only the engine, tank, and one box car got out on the main line. I think the whole six got out. I would not swear point blank about the rate of speed of the passenger train when I saw it, but in my judgment it was running about 30 miles per hour. It did not slow up before the collision that I could tell. No effort was made by those operating the passenger train to prevent the collision that I know of. The train did not seem to slow up any, but came on at the same rate of speed. When· I saw the passenger train coming, I hollered to Fireman Jamison to look out, and then I commenced giving the passenger train the stop signal. I could not see what Jamison did, but he blew the whistle three times. There was scarcely any time between the first and second blasts of the whistle. .It was as· quick as he could blow them.· Then after a little longer time he blew

another blast of the whistle. I hollered to Jamison as he pulled out on the main line, and said, 'Look out, they are coming.' I saw the bulk of Randolph sitting in the window, and I flagged him down with my hat. I don't know whether he saw me or not. I couldn't see him, except I could just see his right shoulder sticking out of the window. I was the nearest man of our train crew to Randolph's passenger engine, on the ground. I was at the switch. Randolph was on the same side of the track I was. I gave Randolph the stop signal four or five times. I was perfectly cool. I knew it was a passenger train, and I knew it was coming right into Jamison. I stated a while ago that there was no way for it to miss him, not if it didn't stop. I had my hat in my hand, and I stood there and signaled him to stop three or four times. I do not know how far Randolph was when I first saw him, before he hit that engine. I never measured it, I don't know whether it was 100 yards or a half mile or three-quarters of a mile, or a mile. I was standing right there by the switch stand, but I stepped out a little bit when I saw they were going to hit, about ten steps from the switch. The switch stand is about two or three feet back from the track. It is about six feet up to where the colors are, somewhere about that. The colors on that switch target were red and green, I believe. I am not sure about that. Some of them have been changed on this yard. I do not know that these colors were red and white. When I threw the switch to enable Jamison to go out on the main line, that threw the red to Randolph's train. I don't know how far you can see a red target on a straight track in daylight. I could see it 100 yards. I don't know whether I could see it 300 yards or not. I wouldn't swear that I could see it half a mile. I don't know how far I could see it on a curve. It depends on how sharp a curve it is, and whether there was any obstruction or not. I don't know how far you could see it around that curve at Navasota, but I suppose you could see it about 20 car lengths, which is about 20 times 38 feet, or 760 feet. As that passenger train came into Navasota, Randolph was sitting in the cab window, with his right arm resting in the window. I could see his shoulder and his cheek, his right shoulder and his cheek, and his right arm was on the arm rest. His right shoulder and his cheek were towards me and he was coming towards me. I did not see the back of his head. I suppose that I could see and tell that Randolph was in the cab of that engine about 20 car lengths (i. e., 760 feet). It might be a little bit more or a little bit less. When I gave Randolph those signals, I mean that I was standing on my feet and waived my hat three or four times straight up and down at my right side. I was standing at the switch at that time. I stood off at the end of the switch tie. I don't suppose it is more than two feet from the switch. It was

in clear view. I gave him that signal three or four times with my hat. I was watching Randolph closely as he came on down the track. I did not see Randolph do anything to stop his engine and train, and I did not see the train slow up. Fireman Jamison, on local freight engine No. 128, reversed his engine; that is, immediately after the collision I found the engine reversed when I got up on it to put out the fire. I know it was reversed because I saw the throttle was wide open and reversed."

C. J. Hagerty, conductor of the passenger train, testified: "I was on my train at the time the collision took place between the engine of my train and a freight train, in which Engineer Randolph and Fireman Jamison were killed. At the time of the collision I was in the smoking car, the second car from the engine. I heard two whistles before the collision. There was probably 15 seconds between the two, or something like that. It was not the whistle of my own engine that I heard. I couldn't tell what those whistles meant. One long blast of the whistle is the signal to stop. When I heard the first whistle, I looked on both sides, and I saw this engine on the right side. I was sitting on the right side, but I couldn't say which track it was on—I couldn't tell whether it was on the main line of the I. & G. N., or the Santa Fé. The conductor has a brake valve situated in the corner of each coach, and the conductor applies the air in the emergency by a valve. He just reaches up and pulls it down. Neither myself nor any other person on that train undertook to apply the air from inside of the coaches. To brace myself against the effects of this collision, I put my left foot against the back of the seat. I already had my foot up there when I stuck my head out of the window, and, after I pulled my head in, I braced myself against one seat with my feet and my back against the other seat. I couldn't tell when I looked out of the window whether that engine was over on our track or over on the Santa Fé track, but what I actually did was to brace myself for a collision. There was no effort by me or any one else that I know of to put on the air. The engineer applied the air probably five seconds before the collision. Of course, the application of the air at that time could have reduced the speed of the train to a certain extent, but very little. It was too late. Up to the application of the air in the emergency, nothing was done that I know of to stop the passenger train or even to lessen its speed. The passenger train was running at the rate of 18 or 20 miles an hour at the time I felt the air go in the emergency."

McKanna, the engineer of Jamison's train who had left the engine of said train in charge of Jamison when the train came into the yards, and who saw the collision from the station, which was some distance from the place of the collision, testified: "At the

time of the collision, to the best of my judgment, there was an engine and four or five cars of Jamison's train that had got out of the side track. I never measured the length of an engine, but to the best of my judgment I would say that it was about 45 feet from the pilot to the rear of the coupler. As to the average length of a freight car, I will just have to make a rough estimate of that— about 38 feet from drawhead to drawhead. In my judgment there was an engine and four or five cars out on the main line at the time of the collision. As to the distance from the point of the collision at which the freight engine could have been seen in the direction from which the passenger train was coming at 11:30 o'clock in the day under ordinary conditions, I judge it could be seen for 26 or 27 car lengths. I never measured it. I am just making a rough estimate of it. That is my best judgment upon the distance at which it could be seen, 26 or 27 car lengths; and each car length, in my best judgment, would be about 38 feet from coupler to coupler. As to the distance within which a train going at the rate of speed such as I saw that passenger train on that morning could be stopped by the proper application of the air in the emergency, with sand and the reversal of the engine, I should judge it would be about 350 or 400 feet. Mr. Randolph, the engineer, was sitting on the right-hand side of the passenger train going north. The engineer is supposed to keep a lookout for stuff on the track and the obstructions of such stuff ahead of him. Engineer Randolph was on the right-hand side of the engine going north. The switch stand which had been thrown by the head brakeman was also on the right-hand side of the track going north. The switch stand was on the same side as the engineer of that approaching passenger train. The switch target is for the purpose of showing a man whether the switch is lined up for the main line or the side track. The switch target stands upright. I don't know how tall it is. It has four, what we call, leaves on it, or flags. You might say flags, and they are painted with different colors. One color represents the siding, and the other colors represent the main line. The colors in use by the International & Great Northern Railroad Company at this switch, at the date of the accident, were red and white; the white signal being displayed on that switch target would indicate to the passenger engineer approaching from the south that everything is clear. The red target would indicate to the passenger engineer approaching from the south that there would be danger. That switch had to be thrown in a certain position in order to enable the freight train to pass out on the main line from that side track. It was necessary to throw that switch before the freight train could pass from the side track onto the main line. To enable that freight train to go out on the main line as it was with an engine and four or five cars, it would change the white signals to the side track and the red signals to the main line; the colors being at right angles to the respective tracks."

Randolph, the engineer on the passenger train, was killed in the collision, and no statement was obtained from him as to when he first saw the freight train on the main track, and what was done by him to prevent the collision. It appears from this evidence that the view of the engineer upon the passenger train was unobstructed, there being nothing to prevent his seeing the freight train on the track in time to have prevented the collision if he had made a prompt application of the air brakes on his train. He was sitting in the cab of his engine in such a position that he must have seen the freight train if he had looked down the track when he heard the warning blasts of the whistle on the freight engine, which he must have heard. That he did see the freight train on the track and realize the danger before the collision and was in possession of all of his faculties is apparent from the fact that he applied the air brakes in an effort to stop his train before he reached the freight, but made the application too late to accomplish that result. The undisputed evidence showing that he was in a position to have seen the freight train in time to have prevented the collision, if he had not been killed and had testified in this case that he did not see it in time, the jury would not have been required to have accepted his statement as true. Brown v. Griffin, 71 Tex. 659, 9 S. W. 546; Railway Co. v. Finn, 107 S. W. 100; Railway Co. v. Brooks, 132 S. W. 98; Railway Co. v. Ball, 96 Tex. 624, 75 S. W. 4; Railway Co. v. Tinon, 117 S. W. 938.

This being true, the fact that the engineer lost his life as a result of the collision does not require a finding that he did not see the freight train in time to have prevented the collision if he had acted with that promptness and decision which ordinary care, under the circumstances of the situation, required. The instant he saw the freight train on the main track he must have realized the danger of a collision and the imminent peril of the deceased Jamison unless the passenger train was stopped in time to prevent a collision, and ordinary care then required of him that he use every means at his command, consistent with the safety of those upon his own train, to avoid the collision. We think the evidence authorized the jury in finding that he failed to use the care required of him, in that he did not act as promptly in applying the brakes as the situation demanded. This does not mean that he was consciously negligent, or that he intended to take an unnecessary risk of losing his own life or of killing or injuring the operatives of the freight train. Frequent exposure to risks and dangers of this kind tend to make men less fearful of such ex-

posure and consequently less careful in guarding against and avoiding such risks. It is a matter of common knowledge that operatives of railway trains and others engaged in like dangerous pursuits often take chances of loss of life or of serious injury under circumstances in which ordinary prudence would forbid such risks. We think it just as reasonable to conclude from this evidence that Randolph saw the freight train ·in time to have prevented the collision. and that in overconfidence of his ability to stop his train in a shorter distance than it in fact required, or for some other unexplained reason, he ·did not· act as promptly as he should have done under the circumstances, as to conclude that he did not hear the warnings given him, and did not see the train upon the track at such a distance from it that he could by the use of the means at hand have prevented the collision. As before said, there was nothing to prevent his seeing the freight train in time to have prevented the collision. All the evidence indicates that he must have seen it, except the fact that he did not stop his train in time to prevent the collision, and lost his life as a result..

The jury have under a proper charge found by their verdict that he did see and realize the peril of Jamison in time to have prevented the injury by the use of the means at his command, and that he was negligent in not making proper use of those means, and we are not authorized upon the evidence disclosed by the record to disturb this verdict.

We are of opinion that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.